Good morning, Your Honors. I'd like to try to reserve four minutes for my rebuttal. May it please the Court, the judgment should be vacated because the District Court made two especially fundamental evidentiary objections that highly prejudiced the City of Pomona. First, it excluded evidence that was directly relevant to the first appeal in this case and that left no doubt about the scientific validity of Pomona's key expert, Dr. Sturteo's methodology. That ruling allowed SQM and its experts to present facts and arguments to the jury that simply were not true in 2015. Second, and compounding that error, the Court permitted SQM's key expert witness, Dr. Layton, to confuse the jury with pure unscientific speculation without any assessment of its reliability about some 42-odd other potential uses of perchlorate, even where SQM's own evidence showed that perchlorate either had not been used or even if it had been used, could not have led to the pervasive contamination in Pomona's groundwater. The combination of these errors was especially prejudicial. Only by disbelieving Dr. Sturteo's isotopic... Can I stop you right there? Yes. So, you know, your opponent, of course, makes the argument that even if the jury did believe Dr. Sturteo's... Is that how you say his name, Sturteo? Sturteo, I believe. Sturteo, sorry. The doctor's methodology, the no causation finding, might still have been justified. And I guess I'd love to hear your response to that because it seemed to me you're asking us with really not much other than speculation to conclude that, but for this evidentiary error that you say the district court committed, the no causation finding would have gone your way. Sure. So if the jury had believed Dr. Sturteo's isotopic fingerprint, that 90% of this perchlorate came from Atacama, then the only choices for where this could have come was sodium nitrate from around the 1940s and before. There was a great deal of evidence that sodium nitrate was imported in fertilizer and put on the ground in the citrus orchards right above the contaminated wells. The other choices were... But, counsel, since you're answering that question, how does that, what you just said, jibe with SCR 281? It's the little diagram with the teardrop-shaped diagram where there's some wells in this draw area that tested negative for any trace. So as an initial matter, they tested non-detect. But Dr. Sturteo testified to the jury that essentially non-detect means that they were below the action level. So we don't know that it's actually zero. And one of the wells up there did detect positive for... Okay, but we're trying to, this is all in context of Judge Watford's question, which is if they believed everything Dr. Sturteo said, what about causation? Couldn't they have decided no causation anyway? So I'm saying that the only choices, the only choices presented to them for Atacama fertilizer would have been the fertilizer or flash bulb... No, no, because it could still have come from the sodium nitrate imported from Chile, but from defendants other than this one. That's my point. Yeah, so that's what I want you to speak to. It was undisputed that SQM was the sole purveyor of... From 1931 to 1940-something, right? And I'm talking about the period before that, right? That stuff was still coming here through other sources. And the evidence in the record is that the stuff that came before SQM became the sole importer was 14% of the stuff that came after. Where is that? So let me tell you where that is. So that is, and it's in our reply brief. So we have at SER 283, we have a graph... I have a really big one. I've blown it up. I'm looking at SER 283. Great. And I appreciate that it runs from 1923 to 19... Yes. But how does this go to Judge Watford's question? Yes, it was certainly not the majority, but so? Wait, wait, wait. Can I just hear? I don't have that in front of me. So what does it say? So it says that between 1923 and 1939, the amount fluctuated from 2,500 to 6,000 tons per year. And then we get to 1940, it's 16,000. 1942, it's 72,000. So overall, the amounts that are coming in during the time that SQM is the sole purveyor are the vast majority. The other thing to keep in mind in the harmlessness context is that the district, the law is, and the jury was instructed that they only needed to find that SQM's fertilizer was more than a trivial or negligible source of the contamination in Pomona's wells. So even if they thought that 14 percent of this came from before or even more, that wouldn't satisfy the test that they were looking at, which was, was SQM's fertilizer more than trivial? And so if I could turn a little bit to Dr. Sturgeo's testimony. So he, the issues he was testifying to were directly relevant to the first appeal here, and they really bore all of the hallmarks of what this court has said makes expert testimony reliable. They were initially outside of the, outside of litigation. That's when Dr. Sturgeo first got involved. They were published. They were peer-reviewed. And his methods are used, isotopic, stable isotope analysis is not some fringe science. It's used by hundreds of people. Can I get you to go to the, since your time is ticking. Accepting all of that is true, and I really appreciate that the status of the science changed pretty dramatically in this window that we're talking about. I think you made a really good showing of that. So on remand, I was struck that at the, I think it's the very first hearing, the judge says, okay, you know, you got right up to the brink of trial, and then we had this interlude of, you know, quite a period of time to go to the Ninth Circuit and come back, and we're ready to go to trial. And I think the city of Pomona said, yes, we can be ready in, you know, about six months. It was a very short, struck me as a very short period of time. So what about that? So, sure. So at that first hearing on January 12th, after remand from this court, the very first thing that Pomona says after good morning is, a lot has happened in three years. We need to update these reports. This was before a trial date was set. And the judge says, put it in writing. I'm going to set my trial date. And Pomona says, again, we really need to update these reports. Now, one thing to understand is. Is this issue on appeal that you think that the pretrial scheduling order was unreasonable? No. So we're not saying it's unreasonable, because in the context of the way this judge runs a trial, if you look at the first trial date before the appeal, all expert testimony, 14 original experts, nine rebuttal expert reports, including three new ones, were all done within 90 days before the trial. And here we're asking to update our expert reports, experts that have already been disclosed. And if you look at Rule 26, it sets sort of a default for that at 30 days before trial. So there was plenty of time in the context of the way this judge runs a trial to do these updates before the June 2nd trial date. So this is abusive discretion standard, right? Sure, yes. What's your best argument? On the Sturgeo, the best argument, so we have two. One, he applied the wrong, the judge applied the wrong standard, because he said that Pomona had not shown that the evidence would be material when the actual standard is relevant. Meaning the updated evidence? Yes. Okay. And then number two, that it was just, it was illogical in the context of this trial. So the primary thing that you look at when you're trying to figure out whether you can update, whether you can reopen discovery under Rule 16, is diligence. And nobody said that Pomona wasn't diligent here. This court has said that's the number one thing. SQM didn't argue it. This expert update couldn't have been done within the original discovery deadlines. The court points to two things. One, the court says it's not relevant. Well, I think it's pretty clear that it's relevant. It was the central topic of the first appeal. Can I ask this just on the diligence point? Why didn't you, as your opponents argue now, just attach, as an exhibit to your motion, the updated reports and say to the judge, see, this isn't that, it's not going to cause all hell to break loose. This is all we've done. Sure. And it would have been good if we had been able to do that. But the judge didn't fault us for that. SQM at the time didn't fault us. He sort of did. He said you've had four years to get ready. There's no excuse for not being ready. I'm paraphrasing. But he kind of did, I think. Didn't he? Not in his order. At the hearing, he said, you know, this trial date shouldn't be very far out because we've had a lot of time to get. And didn't he say something to the effect of your team said, hey, we need to update. And I think the judge said there's no excuse for not being ready. You've had several years to get ready. Sure. And the thing is that the mandate had just come down in December. And the hearing was in January? It was mid-December to early mid-January. I think the unstated response that I didn't see anywhere in the record when the judge said you've had this time is that nobody was doing anything while you're waiting for the Ninth Circuit to rule because if you had not prevailed there, you wouldn't have been back. Sure. And there was a cert stage and all that. But I think the really important thing here is that while we didn't attach the expert report, the motion and the declaration attached to it said exactly what it was going to contain. And it is exactly what it did contain and what we're arguing was important. The motion said that this was significant, that there were additional samples, peer reviews. Sturgeo in his declaration said there's more labs. There's inter-lab comparisons. The database is larger, including samples across the U.S. and around the world. There are peer reviews. All of this deflects. So there was more backup because it was generally better accepted. But his theory, Dr. Sturgeo's theory first time around was we can do this with the isotopes. We can pinpoint where this stuff came from, right? So that opinion hadn't changed. No, his opinion hadn't changed. So isn't that why Judge Watford, I mean, isn't that why the problem that you've got is the jury didn't find causation? So the jury didn't find causation, but we're saying that they didn't find causation because they disbelieved Dr. Sturgeo in part because of these rulings, SQM was able, their main expert, Dr. Aravena, was able to say my two key criticisms are no other labs, nobody else is doing this, and not a big enough database. On closing, SQM said it's so important to have a complete database, citing numbers. But Counselor, here's the deal. If they had believed, if the jury had believed everything Dr. Sturgeo said, why is it they couldn't have found lack of causation? How could that have changed their causation ruling? That's what we're trying to get you to address. Sure, and I'm saying that there was no other viable alternative because Dr. Leighton didn't point to any Atacama fertilizer that could have caused this or any sodium nitrate that could have caused this. What about his, I think it was his testimony, but it was certainly one of their experts who testified that had the source of the contamination been the orchards, we would have expected to see PERC in these areas, and there was none. I know you had an expert who disagreed that that was a valid view of things, but why couldn't the jury have credited that? And I think it's also important to point out that that was not front and center in the trial the way it is. It wasn't at closing. It was there. That was the number one defect in your causation theory that defense counsel singled out in closing. Are we talking about SCR 281 now, this teardrop-shaped diagram with the white wells where there's no detect? Yes. Okay, good. So why couldn't they have found that, even if they believed everything Dr. Sturchow had to say? That's what we'd like you to address, please. So because you also have Dr. Wheatcraft, whose unrebutted testimony is that the way this perchlorate moves is it takes 15 to 30 years to hit the water table, and then it moves. So we wouldn't expect that fertilizer that was put on the ground in 1940 would still be stuck up there. It would have come down to the water table. It would have moved towards Pomona's Wells, which are sucking it in from the capture area. And so, and then the other – That's if you believe Dr. Sturchow, because opposing counsel had testimony that could have taken a whole lot longer for the substance to have moved through the water table. So they didn't dispute Dr. Wheatcraft's particle tracking. They didn't critique that at all. They did suggest, and I think Dr. Wheatcraft agreed, that there could be some that took longer. But we're not seeing – But Dr. Leighton testified it would take a lot longer, right? I don't believe he said it would – he said that, you know, that it could take longer. Not that, you know, on average or in the majority, it would take longer. And it's not exactly right to say it was non-detect. There was one well that was detect up there. It's really close to two other wells, suggesting that there was perchlorate up there. And number two, Dr. Sturchow testified that non-detect essentially means below action levels, right? So there may well have been perchlorate up in those wells, but if it's not above action levels, it's not getting reported. Can I ask, did you by any chance ask for a different special verdict form that might have allowed you to isolate the jury's reasoning on this point? I don't believe that we did. I'd like to make sure to reserve a little bit of time. Sure. Thank you. Thanks so much. We'll give you another minute when you come back. We peppered you with questions. May it please the Court, Art Gaylord Smith, I represent the defendant. The jury did find that defendant was not the cause of the city's injury near its AEP wells. Dr. Sturchow admitted at trial that his isotope technique was incapable of age-dating the Atacama perchlorate and incapable of separating whether it came from fertilizer or industrial uses, SER 107. Pomona did call a witness, his first witness, that was able to fill that gap. His name was Henry Pepper, and he authenticated the 2007 Consumer Confidence Report. That report, admitted into evidence as 4324, stated that the city had conducted an investigation as to the source of the perchlorate near the AEP wells and that it had concluded that the source was, quote, sodium nitrate fertilizer used in the orchards more than 75 years ago. Yeah, I remember seeing that. That didn't seem that great. What about your response to SER 283 and your opponent's argument that- Well, 283 is exactly what we said. By the 1920s, Haber-Bosch, the Germans won the Nobel Prize for creating synthetic nitrates. That's what got them through World War I, as far as they did. But after 1920, the sodium nitrate use collapses. There are synthetic sources that cost less than half the amount. So that chart is totally misleading in terms of concluding what the prior use of sodium nitrate was. What affirmative evidence did you put on to show the relative quantity of Chilean sodium nitrate pre-1931 versus post? We put in evidence by Ford West that it was the predominant commercial fertilizer before 1920. Mr. Sundstrom, Pomona's expert, testified that it was the predominant commercial fertilizer from 1888 to 1922. From the stuff from Chile? From the stuff in Chile. Because it was the only source. It was a magnificent resource. It was the only one. And it was a principal import, and it was very important to that country. But that's all there was. And that's where bombs were made from and gunpowder was made from. It was a source of nitrate. Ubiquitous in industry. So, yes, there was a lot of evidence. Now, Ted Batkin testified as an expert, looking at the California agriculture records, that there were a lot of dealers of sodium nitrate, even in Pomona, until 1920. And then they stopped. So there is abundant evidence of old-time use. But I think that the Henry Pepper... What about just before you move on? You know, your opponent's argument is that under the substantial factor test, they don't have to show that the majority of the perk found in the water came from your client, just something more than trivial. And there does seem to be evidence, at least during the... I can't remember. It was like 1941 to 43. There was a period in which there was quite a heavy, you know, importing of Chilean fertilizer that was exclusively for your client, right? And there was requisition by the United States government of quite a bit for the war effort. Not distributed by my client. Distributed by the government according to war bore priorities, and the number of war bore priority was for vegetables, not citrus. And that was the expert testimony of Ted Batkin, relying upon government records. So that would explain why citrus didn't get it. But however much was used in Tulare County or San Francisco is not relevant to whether sodium nitrate was used then at that time in Pomona. When Henry Pepper writes to all the citizens saying it wasn't used for more than 75 years, it was used more than 75 years ago, he had a basis for that. There are a lot of growers in Pomona. A lot of people are retired there. And the 30s, not so much, but the 40s and 50s certainly are within living memory. And people who lived on farms know what they use for fertilizer, and not one of those people were called. That gives support to Pepper's testimony that they couldn't find a single grower to testify to that. Ted Batkin was the head of citrus research in California. In Road Circuit, he said he talked to 100 or more Pomona and Inland Empire growers. They weren't using sodium nitrate, he says. They used manure. Sodium nitrate was way too expensive. And it wasn't particularly good for citrus because they had sodium in the soil, salt soil. So there was a lot of evidence that the jury could use. But I think the teardrop tells a big story here. When the water is coming from the orchards downward to the contaminated area, and that water is safe to drink, it is below six parts per million. I'm sorry, per billion. One billionth is a very small amount. It is measurable. They have the techniques. But they say this is drinking water quality. By logic, it is impossible that that drinking water quality water could be causing enhanced contamination at the well field. It could not be. Those orchards have been tested clean for 20 years. Sodium nitrate, had it been used in the 30s, 40s, and 50s, would have gotten through and would be contaminating. We know that because Wheatcraft, their expert, says there's a long life. There's a long trail here. And the trail is up to- I think you've exhausted your argument as far as I'm concerned about the causation part. I'm more interested if I could turn you to another position. I'm a little concerned about this failure to do the Daubert properly for Dr. Leighton. Here in this court, if I understand it correctly, everybody understands that he should go through a Daubert hearing, but there wasn't any. And indeed, what did the judge do in his response? Well, the judge didn't have a Daubert hearing. I think the teachings of this court- No, wait a minute. What did he say? What did he do? Well, he denied it tentatively. He said denied. I read it. He said denied. He didn't hold a hearing. Correct. And how does that square with Daubert? You can't just deny. They never got an opportunity to challenge- appropriate opportunity to challenge that expert. He had 18 motions in limine. He had one on Leighton that attacked one of his multiple opinions. Listen, I understand that. But you're dancing around it. Why can we say that it was okay for him just to send an order saying denied and not have a Daubert hearing for Dr. Leighton? I believe it's the teaching of this court that there is not a concrete rule that Daubert hearings must be held. I believe that. I think that's what Barabin says. What about findings? Findings? I think that has to be viewed. I think it's a flexible inquiry. What's your strongest support for this? Because what Judge Wallace is asking is, you know, what's your strongest support for this ruling being adequate, please? That it wasn't final. The strongest authority is? One, that it was not final. Forgive me. All right. It wasn't final? I read the agreement. It just said denied. It didn't say tentatively denied. It just said denied. Actually, it does. The minute order has the 18 rulings, and at the top it says either draft or tentative. Oh, so you want the one that fits you best. So what is he saying? I'm going to have it next week, but I'm certainly going to do a Daubert hearing because I know I have to. He talked about that on June 2. I understand. But when did he get around to holding a Daubert hearing? Never did. Never did. Why isn't that error? I think it's not error because he said both then and at the start of the 2015 trial that my rulings were tentative, and I want to hear the evidence as it comes in, and I'll hear your motion again. So when I put on the witness and put on his qualifications. Now we're talking about Dr. Layton? Dr. Layton. Okay. And then I asked him, you know, what's the basis of your opinions that you're criticizing the failure to consider alternative causation opinions? He says it's based upon EPA and DTSC guidance that provides that this is how you do an environmental investigation. I've been doing this for over 20 years. And I says, okay, based upon this, what is do you have an opinion? Yes, I do. And he said my opinion is I don't think Sturgeon did an incompetent environmental investigation of alternative causation. Are you saying that was a Daubert hearing? I think that's where counsel stands up and says objection. So if there was error in not holding a Daubert hearing, it was waived by not making an objection. That's interesting because the statement itself says denied. You're saying up at the top, some are, some aren't. But they could interpret it as I was an attorney with a language the district judge uses, it's denied. What you're saying is if you look back at it now in hindsight months later, we can say, well, he wasn't denying. He just says we want to hold it later. But Daubert hearings aren't held in the middle of trial. Daubert hearings are separate hearings. In what way was he saying that was a Daubert decision? By the time we went to trial in 2015, Barabin had held that a Daubert hearing is not required. One needs to look at the context of the particular expert testimony, and the court has discretion to not have a pretrial Daubert hearing, but to undertake that examination in Vardyar. Just stop in the middle of a trial and hold a Daubert hearing in front of? I think a district court. Was there in there where the district judge said, I'm holding that this person can testify and I've now had a Daubert hearing? Nothing. I'm sorry, Your Honor. When did the district judge say this is my Daubert findings? He didn't make an express finding of reliability. There was no objection interposed. There wasn't an objection to tell him what he said before he had to do? Are you talking waiver here? I'm talking waiver. I think there was no preservation of objection under 103, because his testimony came in. Was this raised to the district judge, making an argument of why we can't reverse on this basis? No. Had there been an objection, Your Honor? Yeah. Had there been a request to have a Daubert hearing? A second request. Well, the motion didn't request a Daubert hearing. It objected on Daubert. This judge showed a penchant for anybody who wanted to raise an objection, please file a motion, and we'll have a hearing on it. There was no request for a Daubert hearing. And had there been a Daubert hearing, you would have had the same evidence that you have before you now, and under Barabin, you may make this decision now, whether he was qualified and whether he was correct. Or we can remand it and let the trial judge do it. Well, Barabin gives you that authority and saves us a lot of time to do that. But I want to talk about, I want to defend the judge's decision not to change the scheduling order and not to allow. Let's move to another question, and then you can do that. I'm a little concerned about the situation as I see it. There was a criticism of the principal, Dr. what's his name, Pornos? Sterkio? Sterkio. There's a criticism that he didn't have sufficient data, there wasn't been tests. So there's a long time, a big gap of time. During that time, all of a sudden, there's some things that were criticized about his decision. Now, there's something there that we can say that is there. So at the very beginning, when this case comes back from our court, which gives the district court jurisdiction, it's raised then that he's now in a position to justify further. So we've got to do a Daubert hearing on that. But there is no Daubert hearing. And the evidence now where the judge initially was critical has now been fortified with new evidence. And yet he's not allowed to use that. He's used a five-year-old report, even though the evidence is now there that the five-year-old report has been verified. Tell me what is fair about that. I'll tell you what was not fair, Your Honor, was when he says he has all this unpublished data, and he has studies that we don't have, and they don't give it to us. They make a motion, and they ask the court for the Earth, the Moon, and the stars in terms of reopening discovery, precipitate witnesses, all experts. And then at the very end of the motion, they say, By the way, STRICIO has more data. They don't discuss what it is except for one report. He says in his declaration, I have prepared a 2014 report that discusses my data from my 2011 report. That's not new data. Read the declaration carefully. He doesn't identify the source or publication of any new data. And here we are in Chile and in San Diego, and we don't know what the data is. Well, okay, all right, but that may be true, but the judge never asked for that. The judge just said, Make a motion. He said, Make a motion, and the motion that was made. Okay, now get me on timing. A motion is made, and they've got one month to do it. The judge sits on it for two weeks, and then said there isn't sufficient time. The motion is very important. Yes. The motion, the introduction of the motion, the introduction is where we usually make our best argument. The entire introduction is about the other discovery. Pomona wants. He doesn't mention STRICIO, doesn't mention the new data. Now we're standing here that this is the most critical data in the whole case, and it deserves to overturn the verdict. Well, the district court wasn't told that in March. The district court was only told, and this is really important. The first he's told is on page 2. The site, please, ER. This is page 2 of the motion itself. Somebody will help me with that on the ER. Okay, page 2 of the motion. Go ahead, please. In page 2 of the motion, there have also been advances in isotopic analysis, including additional studies. Additional samples added to the reference database. Procured isotope values and peer review articles. Period. That's it. Not where they're from, whether it's going to be difficult for the defense to run those down, to get the analytical results behind them, get the lab reports to see if they're true, if they're real data. Nothing is mentioned. Okay. But it's certainly clear that this particular witness, his testimony would be far better if he had now why it wasn't better before. Well, it doesn't say that. That was a vital part of the case. They didn't have time until the district judge had jurisdiction. They filed a motion promptly after the case came back to them. Then the motion is the judge says, okay, file a motion. He sits on it two weeks and then denies it. He is not told what the court just mentioned, that this was vital to Sturkeel, that it removed objections that had been made. It didn't even identify where the data was. So the district court is experienced. That type of general high-level proffer by an experienced lawyer raises suspicion. What's this all about? Is this going to unravel my schedule? Okay. So you're figuring out what was in his mind, but that's not in the record. What is in the record is that they came in with a motion, and this was vital to their case because counsel argued at the trial of this case that there is no such evidence. But we know there was evidence. It just wasn't allowed to get in by the district court. Now it seems to me that there should be some answer to that issue. You're way over time. So could you sum up your response to Judge Wallace's question? He has asked it several times. Yes, it is. It is looking. The district court judge has to be evaluated in his discretion at the time he made his decision with the data that was presented, and the data that was presented was a very tepid, non-critical showing by Sturkeo. He did not say, I need this data to make my opinion work. And the three lines that are in the beginning, and there's three more lines at the end, that gave this district court judge no idea that there was a torpedo that would blow up the verdict. We understand. Thank you. Closing counsel, please. We'll put two minutes on the clock. I know my time is short. I'd like to get in. You're going to need to respond to the argument that essentially the district court wasn't fairly informed of the basis of the objection, and Judge Klozner wasn't given a fair shot at understanding how important this was to your case, please. Sure, and I'd like to do that. And I'd like to walk you through. We talked about how the Ninth Circuit's opinion was all about this testimony, its reliability, and in particular the size of the reference database. We get back to the first January 12th hearing, the very first thing Pomona says is, we need to update this. We need to update this. They say that twice. And then in the motion, it says exactly the update they're going to do. It says we have these several more peer reviews. Now, one of the questions in this case was, is this accepted by the scientific community? Peer reviews are really significant. This court has said they're really significant for reliability. They say we have many more samples from across the U.S. And this is exactly what his updated report reflected, and it wouldn't have been a surprise to anyone. The question is, what did you do to put the trial judge on notice of how important you think this is? You heard opposing counsel say, in retrospect, you think it's taken on big proportion. Is your response that the judge was on notice because that was the issue on appeal? So that's part of the context, but also because we said this is significant. This is what we're going to show. Dr. Sturchio said in his declaration. This will deflect the criticisms. When you're saying we said, you're not. Sorry. Opposing counsel has read about two sentences from the motion, and I think that's all that's in the motion. Do you mean at a hearing or help us out? No, no. In the motion at ER 616, we say this is significant. There's additional samples. There's peer reviews. We notice it for a hearing so that there can be more argument. In Dr. Sturchio's declaration at ER 607 to 609, he talks about the additional labs, interlaboratory comparisons, database larger, including samples from across the U.S. and around the world, peer reviews. That declaration was submitted with the motion. It's submitted with the motion. Thank you. How about the response on the Leighton-Daubert issue? So first of all, it wasn't waived. If you look at ER 2, that is a final ruling. The original ruling said tentative in 2011. I thought the judge said shortly before trial that all of my rulings on Okay, so if you compare the 2011 one, which says tentative, the 2015 one, which omits that and says in bold, all caps, deny, and then you see that statement, which I think is really a statement of a district court's authority to always change its mind, but this court's cases, particularly Ben Simon and Mukhtar, they say, unless the circumstances have changed, there's no real reason to expect. I thought that was the opposite, that unless the court made absolutely clear that I'm not revisiting this, then your obligation is to, during trial, renew the objection. Because by definition or by their nature, rulings on motions in limine are tentative. No, I would say that in cases, in Ben Simon, in Mukhtar, they say, we don't expect you to keep pestering the judge unless there's a circumstance. But what about where the judge explicitly tells you right before trial, everything I ruled before, it's open to, I'm open to being persuaded otherwise. You need to let me know during trial and I'll reevaluate. Sure, and as soon as latent testimony turned towards alternative sources, as soon as he says there are multiple industries, right away Pomona gets up and says, may I voir dire the witness? And he said, and the judge says no, and you think that's sufficient to preserve the objection? And the judge says no, and then the next page, Pomona says, I object. It's shotgun, and it includes every gas station, every dry cleaner, anything that has nothing to do. But that's not a Daubert objection. So the request of voir dire, I understand how that might be related to a Daubert-related ground. Well, this is a Daubert-related ground because our argument was that this was pure speculation, that it wasn't based on a reliable methodology. The next break occurred. The judge, as I understand it, allowed the lawyers to put on the record things that shouldn't have been argued before the jury. Did you at that point say, Your Honor, we want to make clear for the record that we requested voir dire. You denied it. We think that this person cannot be allowed to testify absent Daubert findings. I didn't see that in the record. So that isn't in the record, but the very first time in 2011 that the judge rules and denies this motion in Lib Nay No. 3, Pomona says, you gave this denial without any reasoning. Is there going to be a chance for further argument? And the judge says, I feel comfortable. I've heard you've briefed this adequately. I feel comfortable. So I think that this judge, that there was no reason for Pomona to sort of antagonize this judge by continuing to bring up an ejection that they brought up in 2011, was ruled on definitively in 2015, and then they bring up again right at the beginning of Dr. Layton's alternative use source testimony, and the judge says again, no, overruled. This judge was not, it would have, I think, been futile to keep objecting. If I could get to the quick points I wanted to make really quickly on harmless error, first I just want to say that it is SQM's burden under a state of Barbara to show that it's harmless. In addition to the other points I made at ER 120, Layton says that the contamination might not have hit the wells for a lot of reasons. We got to the tentative final. And then I want to say on the gatekeeping error that while a Daubert hearing is not required, this court has drawn a very sharp line between some findings and no findings. Mukhtar says the only reason that we can figure out that the court found the person reliable is that they were allowed to testify. That's not enough. And the state of Barbara says that that gatekeeping error, that leads to a new trial. And here the evidentiary rulings allowed SQM to tar Dr. Stuccio as a pseudoscientist and lend this aura of authority, this misleading, dangerous aura of authority to Dr. Layton, and neither could be further from the truth. Thank you. Thank you, counsel. Thank you all. Appreciate your argument. We're going to stand and recess for about ten minutes, and we'll be back to hear the last argument. All rise.
judges: Wallace, Christen, Watford